Peter D. PETERSON, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the INTERIOR, et al., Defendants. (Four Cases)

DUNNIGAN WATER DISTRICT, Plaintiff–Appellant,

v.

UNITED STATES of America; Donald P. Hodel, in his capacity as Secretary of the Department of the Interior; C. Dale Duvall, in his capacity as Commissioner of the Bureau of Reclamation of the United States of America, Defendants–Appellees,

and

Natural Resources Defense Council, Inc., Defendant/Intervenor–Appellee.

CENTRAL VALLEY PROJECT WATER ASSOCIATION; Sacramento River Water Contractors Association, Plaintiffs–Appellants,

v.

DEPARTMENT OF THE INTERIOR; Donald P. Hodel, Secretary of the United States Department of the Interior; United States Bureau of Reclamation, Defendants–Appellees,

and

Natural Resources Defense Council, Inc., Defendant/Intervenor–Appellee.

WESTSIDE WATER DISTRICT, a public entity; Kanawha Water District, a public entity, Plaintiffs–Appellants,

v.

UNITED STATES of America; Donald P. Hodel, in his capacity as Secretary of the Department of the Interior; C. Dale Duvall, in his capacity as Commissioner of the Bureau of Reclamation of the United States of America, Defendants–Appellees,

and

Natural Resources Defense Council, Inc., Defendant/Intervenor–Appellee.

ARVIN–EDISON WATER STORAGE DISTRICT; Southern San Joaquin Municipal Utility District; Panoche Water District; San Luis Water District; Lower Tule River Irrigation District; Delano–Earlimart Irrigation District; Tulare Irrigation District; Catherine Stevens Zahn; Laverne Stevens Siebert, Plaintiffs–Appellants,

v.

UNITED STATES of America; Donald P. Hodel, in his capacity as Secretary of the Department of the Interior; C. Dale Duvall, in his capacity as Commissioner of the Bureau of Reclamation of the United States of America, Defendants–Appellees,

and

Natural Resources Defense Council, Inc., Defendant/Intervenor–Appellee.

Peter D. PETERSON, et al., Plaintiffs–Appellants,

v.

UNITED STATES of America, et al., Defendants–Appellees,

and

Natural Resources Defense Council, Inc., Defendant/Intervenor–Appellee.

Nos. 87–2681, 87–2766 and 87–2779 to 87–2781.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1989.

Decided March 14, 1990.

As Amended May 11, 1990.

Thomas W. Birmingham, Kronick, Moskovitz, Tiedemann & Girard and Ronald A. Zumbrun, Robin L. Rivett, Pacific Legal Foundation, Sacramento, Cal., for plaintiffs-appellants.

Robert L. Klarquist, Dept. of Justice, Washington, D.C., for defendants-appellees.

Brian E. Gray, and Hamilton Candee, Natural Resources Defense Council, San Francisco, Cal., for defendant/intervenor-appellee.

Before NORRIS, NOONAN and LEAVY, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

In these consolidated cases, we are asked by various public water agencies in Califor-

nia's Central and Solano Valleys (the "Water Districts") to declare unconstitutional a provision of the Reclamation Reform Act of 1982 which interferes, they argue, with their contractual right to receive subsidized water from federal reclamation projects for distribution to agricultural users in their districts.[1] This appeal raises important questions of Congress's ability to reshape federal water policy and to decide who shall receive federally subsidized water from the government's reclamation projects in the western states.

## I

Each of the Water Districts entered into a long-term contract in the past 30 years with the Department of the Interior, Bureau of Reclamation ("the Bureau") to receive water from two vast systems of federally-owned and operated reservoirs, dams and canals: the Central Valley Reclamation Project and the Solano Project.[2] Under these contracts the federal government agreed to provide water to the Water Districts at a fixed rate for the contract period. Although each District was charged a different rate for the water it received, all of the contract rates represent a significant government subsidy. In exchange, the Water Districts agreed to distribute the water to eligible lands within their jurisdictions. The only express eligibility requirement contained in the contracts was that no water could be provided to any farm in excess of 160 acres whether owned by a natural person or a corporation. Because the contracts did not expressly prohibit the Water Districts from providing water to

farms of more than 160 acres if the land was leased rather than owned, the Water Districts have for many years delivered subsidized water to farms consisting of thousands of acres of leased land, as well as to small farms complying with the acreage limitation.

The Reclamation Reform Act of 1982, 43 U.S.C. §§ 373(a); 390aa–390zz–1; 422e; 425b; 485h; 502 (1982 & West Supp.1989) ("the RRA") amended federal reclamation law in three important ways: (1) it increased the acreage limitation from 160 to 960 acres;[3] (2) it closed the "leasing loophole" by making the acreage limitation expressly applicable to holdings that were leased as well as owned; see 43 U.S.C. §§ 390dd, 390ee, and (3) it raised the price of reclamation water to a level that reduced, but did not eliminate, the federal subsidy. See 43 U.S.C. § 390hh.

The provision of the RRA in dispute in this litigation is section 203(b), also known as the "hammer clause." The hammer clause puts water districts to an election. They are permitted to amend their contracts to conform to the requirements of the RRA, which means a 960–acre limitation applicable to all lands, whether owned or leased, and an increased, but still subsidized, price. If Water Districts choose not to so amend their contracts, they are permitted to deliver water to leased lands in excess of 160 acres provided they pay the government's "full cost" of delivering the water. 43 U.S.C. § 390cc(b).[4]

In these cases, the Water Districts claim that application of section 203(b) to their existing water contracts violates the due

---

1. Several landowners who receive reclamation water from the water districts are also named as plaintiffs in these cases. The landowners do not claim that they have any right to reclamation water that is not dependent on the water districts' contractual right to the water. Accordingly, we refer to the plaintiffs collectively as the "Water Districts."

2. Most of the contracts are for 40–year terms and are due to expire in the mid–1990s. Many, however, do not expire until after the year 2000, and one does not expire until 2026.

3. The RRA made one exception to the new 960–acre limitation: Large business entities, defined

as those benefiting more than twenty-five persons, could not receive reclamation water at subsidized rates for any land owned or leased in excess of 320 acres. 43 U.S.C. § 390ee(a)(2) & (3).

4. The term "full cost," as used in the Act, means "an annual rate ... that shall amortize the expenditures for construction properly allocable to irrigation facilities in service, including all operation and maintenance deficits funded, less payments, ... with interest on both accruing from October 12, 1982." 43 U.S.C. § 390bb(3)(A).

process clause and the taking clause of the fifth amendment.[5] The district court granted the government's motion for summary judgment on both claims, and the Water Districts now appeal. We affirm the district court's decision that neither the due process nor the taking clause prevents Congress from limiting the volume of subsidized water that the Water Districts can deliver to leased lands under their pre-existing contracts with the Bureau of Reclamation.

## II

The starting place for understanding the 1982 amendments to the federal water reclamation law is nearly one hundred years ago when the federal government initially became involved in developing irrigation systems for the western states. The opening of the West to farming through the harnessing of its waters provides not only fascinating history but also necessary background to the constitutional questions raised by these cases.

The final westward migration of the late 1800s resulted in an enormous demand by the settlers for irrigation systems.[6] The western states, however, lacked the means to finance the enormous systems of dams, reservoirs, and canals needed to regulate and distribute water from the western rivers and snow melt. *See California v. United States*, 438 U.S. 645, 663, 98 S.Ct.

2985, 2995, 57 L.Ed.2d 1018 (1978). Responding to the pressing demand for federal assistance in funding water reclamation projects, Congress passed the Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified as amended at 43 U.S.C. §§ 371–600e (1982)).

With the Reclamation Act of 1902, Congress committed itself to the task of constructing and operating dams, reservoirs, and canals for the reclamation of the arid lands in 17 western states. *California*, 438 U.S. at 650, 98 S.Ct. at 2988.[7] The projects were to be built on federal land and the actual construction and operation were to be in the hands of the Secretary of the Interior. *Id.* at 664, 98 S.Ct. at 2995.

The Congress that enacted the Reclamation Act of 1902, however, had far greater expectations for the program than simply an increase in the West's agricultural production. With the Reclamation Act, Congress created a blueprint for the orderly development of the West, and water was the instrument by which that plan would be carried out. *See Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 292, 78 S.Ct. 1174, 1184, 2 L.Ed.2d 1313 (1958). Congress was particularly concerned that the reclamation projects not fuel land speculation in the West or contribute in any way to the monopolization of land in the hands of a few private individuals.[8] The

---

**5.** The fifth amendment provides: "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Water Districts also brought claims against the United States based on 42 U.S.C. § 1983, the ex post facto clause, the equal protection clause and the doctrine of equitable estoppel. The Water Districts do not appeal the district court's dismissal of these claims.

**6.** As early as 1891, settlers in the western states organized annual Irrigation Congresses, where delegates met to discuss their water needs and to urge Congress to fund federal reclamation and irrigation projects. *See generally* Taylor, *The Excess Land Law: Execution of a Public Policy*, 64 Yale L.J. 477, 481–85 (1955).

**7.** Of all the federal reclamation projects undertaken, the Central Valley Project is the largest. In 1958, the Supreme Court described the CVP as follows:

> [The Central Valley Project] was born in the minds of far-seeing Californians in their endeavor to bring to that State's parched acres a water supply sufficiently permanent to transform them into veritable gardens for the benefit of mankind. Failing in its efforts to finance such a giant undertaking, California almost a quarter of a century ago petitioned the United States to join in the enterprise. The Congress approved and adopted the project, pursuant to repeated requests of the State, and thus far has expended nearly half a billion dollars.

*Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 280, 78 S.Ct. 1174, 1178, 2 L.Ed.2d 1313 (1958).

**8.** The legislative history of the 1902 Act is replete with references to the anti-monopoly and anti-speculation goals of the bill and to Congress's desire that the federally subsidized water be used to create landholding patterns consistent with its vision of an agrarian society of

congressmen and senators who sponsored the bill described it as a necessary measure to guard against the rampant land speculation of the late 19th century and to create in its stead small family farms and homesteads for the rapidly increasing population. Representative Newlands, the author of the 1902 Act, stated that "the very purpose of this bill is to guard against land monopoly and to hold this land in small tracts ... to give to each man only the amount of land that will be necessary for the support of a family." 35 Cong.Rec. 6734 (1902). Similarly, Senator Hansbrough of North Dakota, a co-sponsor, introduced the reclamation bill into the Senate by stating: "Mr. President, the purpose of this measure is to assist in providing homes for the rapidly increasing population of the country." *Id.* at 1383.

Congress's goals in enacting the Reclamation Act of 1902 have never been in doubt. As the Supreme Court observed in *Ivanhoe*, Congress clearly intended the federal reclamation projects to promote the growth of an agricultural society in the West "by limiting the quantity of land in a single ownership to which project water might be supplied." 357 U.S. at 292, 78 S.Ct. at 1184. And as our circuit has said, the Reclamation Act of 1902 was animated by three primary goals: "to create family-sized farms in areas irrigated by federal projects ..., to secure the wide distribution of the substantial subsidy involved in reclamation projects and [to] limit private speculative gains resulting from the existence of such projects." *United States v. Tulare Lake Canal Co.,* 535 F.2d 1093, 1119 (9th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1156, 51 L.Ed.2d 571 (1977).

To accomplish these goals, Congress established eligibility requirements for those who could receive water from any of the federal reclamation projects funded under the Act. First, and most importantly, Congress provided that "[n]o right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner." 43 U.S.C. § 431. It so happens that 160 acres was also the limit on the amount of public land made available to individuals and families under the Homestead Acts,[9] reflecting Congress's view at the time of the appropriate size for a "family farm." *See* Sax, *Federal Reclamation Law* § 120.1, at 210, in 2 Water & Water Rights (R. Clark ed. 1967).

Second, Congress prohibited the sale of project water to any landowner who was not "an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of such land." 43 U.S.C. § 431.

Finally, in a series of significant amendments to the Act, Congress established additional controls over land speculation by requiring users of reclamation water who owned land in excess of 160 acres to enter into "recordable contracts" with the Secretary of the Interior, in which they would agree to sell their excess land within ten years. *See, e.g.,* Omnibus Adjustment Act of 1926, 43 U.S.C. § 423e.[10] The sale price was set by the Secretary and reflected the value of the land prior to construction of the reclamation projects, thus removing a windfall to those who had acquired large landholdings before an irrigation project was completed. In exchange, during the

---

family-owned farms. Frank Mondell of Wyoming described the bill as "a step in advance of any legislation we have ever had in guarding against the possibility of speculative land holdings and in providing for small farms and homes on the public land, while it will also compel the division into small holdings of any large areas ... in private ownership which may be irrigated under its provisions." 35 Cong.Rec. 6677 (1902); *see also* Taylor, *supra* note 6, at 484–85; Taylor, *National Reclamation in Imperial Valley: Law v. Policy,* 11 Ecology L.Q. 125, 125–26 (1983).

9. *See* Homestead Act of 1891, ch. 561, § 5, 26 Stat. 1097 (repealed 1976).

10. The 1926 amendment was preceded by a 1914 amendment which provided:

[T]he Secretary of the Interior shall require the owners of private lands [receiving water from a reclamation project] to agree to dispose of all lands in excess of the area which he shall deem sufficient *for support of a family* on the land in question....

43 U.S.C. § 418 (1982) (emphasis added).

ten years prior to sale, the excess land could receive project water.

These three restrictions are evidence that:

> [f]rom the beginning of the federal reclamation program in 1902, the policy as declared by the Congress has been one requiring that the benefits therefrom be made available to the largest number of people, consistent, of course, with the public good. This policy has been accomplished by limiting the quantity of land in a single ownership to which project water might be supplied. It has been applied to public land opened up for entry under the reclamation law as well as privately owned lands, which might receive project water.

*Ivanhoe*, 357 U.S. at 292, 78 S.Ct. at 1184. There is no question that the Reclamation Act "was designed to benefit people, not land." *Id.* at 297, 78 S.Ct. at 1186.

Originally, the Department of the Interior was given responsibility not only for constructing the reclamation projects, but also for administering the distribution of water to agricultural users in a project service area. In 1926, however, Congress amended the reclamation laws to remove from the Department the primary responsibility for distributing water and monitoring its use. Omnibus Adjustment Act § 46, 43 U.S.C. § 423e. Instead, the Secretary of the Interior was directed to enter into long-term water service contracts with irrigation districts organized under state law. It was left to the individual districts to execute subcontracts with the actual users of water and to deliver the water. Under this arrangement, the water districts, rather than the United States, had responsibility for ensuring that recipients of project water were complying with federal reclamation law, including the acreage limitation and excess-land sale requirement. *See Tulare*, 535 F.2d at 1094.

Although the Reclamation Act of 1902 had originally intended to recoup the costs of constructing and operating the projects through the sale of federally-owned western lands, *see* 43 U.S.C. § 391, almost immediately the funds proved inadequate, and

Congress had to restructure the program's financing. In a series of amendments to the Act, Congress provided that a portion of the capital costs of the projects, as well as a portion of their operating and maintenance costs, would be charged to the users. *See* 43 U.S.C. § 492 (enacted in 1914); 43 U.S.C. § 493 (enacted in 1924); 43 U.S.C. §§ 423e & 423f (enacted in 1926). However, Congress did not expect to recover all of the construction costs, nor did it expect to recover interest on any of the costs the federal government had incurred. For example, in the case of the Central Valley Project, it was recognized from the outset that the irrigation water payments would be insufficient to return more than a fraction of the allocated construction costs. *See City of Fresno v. California*, 372 U.S. 627, 631, 83 S.Ct. 996, 998, 10 L.Ed.2d 28 (1963).

The Department's practice of entering into long-term contracts at fixed rates only highlighted the fact that the projects were incapable of paying for themselves. By 1982, the Congressional Budget Office calculated that the United States would in the next five years spend roughly $3.8 billion on Bureau of Reclamation water projects, but would recoup only $275 million as a result of existing reclamation repayment policies. Cong.Rec. S 8318 (daily ed. July 15, 1982) (statement of Sen. Proxmire).

As the program has been administered by the Department of the Interior over the course of this century, it has become clear that this vast federal subsidy has been flowing to many farming operations which in no way resemble the small, family-owned farms envisioned by the enacting Congress. Although observers were optimistic during the early years of the projects about the program's ability to break up large landholdings and the Department's willingness to enforce eligibility requirements, *see* Taylor, *Imperial Valley, supra* note 8, at 126, by the 1950s the water districts and the farming interests had found ways to circumvent the 160–acre limitation and the forced sale provision.

One of the primary means for avoiding these two eligibility requirements of the

reclamation law was the practice of leasing.[11] *See* 128 Cong.Rec. 16,596 (1982) (statement of Sen. Exon) ("Leasing has historically been one of the principal devices used by large landowners for avoiding the acreage limitations in the past."). The reclamation laws themselves made no mention of whether leased lands were or were not entitled to receive reclamation water; the laws only provided that reclamation water could not go to any lands in common ownership in excess of 160 acres. The water service contracts that the Bureau entered into with the water districts tracked the language of the 1902 Act and thus did not include any reference to leased lands. Because the water service contracts permitted the water districts to purchase as much water as needed for eligible lands within their districts and allowed the water districts to determine which lands were eligible, water districts bought far more water than could be used by 160–acre, family-owned farms in their service areas. The excess water was provided by the water districts to farms whose lands held in common ownership did not exceed the 160–acre limitation, but whose operators also controlled leased lands of many thousands of acres. Although the Department of the Interior was aware that unlimited leasing was being used to circumvent the 160–acre limitation, it took no action to prevent the practice.[12] As to the residency requirement, the Department ignored it altogether after 1926.[13]

The "leasing loophole" was freely exploited by the water districts and large farming operations for many decades. By 1981, it was clear that the original blueprint for the development of the western lands embodied in the reclamation laws had not been met and had, in fact, become obsolete. The 160–acre family-owned farm was no longer an efficient, or even viable, means of farming in the West. *See* S.Rep. No. 97–373, 97th Cong., 2d Sess. 9 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2570, 2573. Moreover, only a fraction of the farms actually receiving reclamation water were of that size. By 1981, only 23% of the land receiving federal reclamation project water was farmed in operations of 160 acres or less. 128 Cong.Rec. 16,599 (1982) (document submitted by Sen. Exon). Three percent of the farming operations receiving reclamation benefits controlled 30% of all of the irrigated lands in the program. 128 Cong.Rec. 16,421 (1982) (statement of Sen. Proxmire). The largest farms, which comprised 20% of the irrigated acreage in the program, averaged 3,721 irrigable acres. 128 Cong.Rec. 16,599 (1982). The greatest individual beneficiaries of the practice of unlimited leasing were large corporate farming operations located in California's San Joaquin Valley. 128 Cong.Rec. 8810 (1982) (statement of Rep. Weaver).

The federal subsidy to these large farming operations was enormous. The contract price of water delivered to the Water Districts ranged from $2.00 to $7.50 per acre foot. In contrast, the actual cost to the United States of providing this water was between $8.43 and $55.61. The value of the water subsidy provided to Southern Pacific Land Company alone was estimated at $6 million per year. 125 Cong.Rec. 24,342 (1979) (statement of Sen. Nelson). In this litigation, the Department of the Interior has calculated the average present value of the irrigation subsidy for recipients

---

**11.** Technically ineligible lands also could receive reclamation water by sinking wells into the underground water supply into which much of the reclamation water ultimately flowed. *See* Taylor, *Excess Land Law: Calculated Circumvention*, 52 Calif.L.Rev. 978, 987–89 (1964).

**12.** The Bureau did ban leaseback arrangements, the most "flagrant use of leases to circumvent

the excess land provisions of the law." Huffaker & Gardner, *The "Hammer" Clause of the Reclamation Reform Act of 1982*, 26 Nat. Resources J. 41, 59 (1986).

**13.** *See also* Kelley, *Acreage and Residency Limitations in the Imperial Valley: A Case Study in National Reclamation Policy*, 23 S.D.L.Rev. 621, 622 (1978).

of water from the Central Valley Project to be $1,850 per acre.

In 1977, in response to a preliminary injunction ordering the Bureau of Reclamation to promulgate rules to implement the acreage limitation and excess land provisions, *see National Land for People, Inc. v. Bureau of Reclamation*, 417 F.Supp. 449 (D.D.C.1976), the Department of Interior moved to close the leased land loophole. Its proposed rule stated that "[n]o person or legal entity shall be entitled to lease more than 160 acres of land served by federal water provided pursuant to the reclamation laws." 42 Fed.Reg 43,044, 43,047 (1977). Those regulations never went into effect, however, because they were superseded by Congress's enactment of the Reclamation Reform Act of 1982.

With the Reclamation Reform Act, Congress redefined completely who could receive subsidized reclamation water and the price they would pay. The price charged for reclamation water was increased to keep in line with increased operating and maintenance costs. At the same time, the 160–acre limitation was discarded as incompatible with modern farming techniques. In its place, Congress authorized the sale of project water at the new, though still subsidized, rates to "qualified recipients" for landholdings up to 960 acres and to "limited recipients" for landholdings up to 320 acres. 43 U.S.C. § 390ee(a). Qualified recipients include individual citizens, resident aliens, and "any legal entity established under State or Federal law which benefits twenty-five natural persons or less." 43 U.S.C. § 390bb(9). Limited recipients are legal entities that benefit more than 25 natural persons. 43 U.S.C. § 390bb(7). This change results in a six-fold expansion of the acreage limitation for qualified recipients, and a two-fold expansion for limited recipients.

As part of the Reclamation Reform Act, Congress closed the "leasing loophole." The RRA now defines a landholding as the "total irrigable acreage of one or more tracts of land situated in one or more districts owned or operated under a lease which is served with irrigation water pursuant to a contract with the Secretary." 43 U.S.C. § 390bb(6). Although the Act does not bar the Department of Interior from providing water altogether to qualified recipients for use on leased lands that exceed the 960–acre limitation, the recipients are required to pay the "full cost" for any such water. 43 U.S.C. § 390ee(a). Finally, the Act eliminates the never enforced residency requirement. 43 U.S.C. § 390kk.

In these cases, the Water Districts challenge the constitutionality of section 203(b) of the Act, the so-called "hammer clause." 43 U.S.C. § 390cc(a) and (b).[14] Section 203(b) gives the Water Districts the option of amending pre-existing contracts to conform to the RRA's new provisions, the most important of which are: the increased 960–acre limitation and the decreased subsidy for reclamation water. Those water

---

**14.** Section 390cc(a) and (b) provide:
New or amended contracts.
(a) Generally.
The provisions of this subchapter shall be applicable to any district which—
(1) enters into a contract with the Secretary subsequent to October 12, 1982;
(2) enters into any amendment of its contract with the Secretary subsequent to October 12, 1982, which enables the district to receive supplemental or additional benefits; or
(3) which amends its contract for the purpose of conforming to the provisions of this subchapter.
(b) Amendment of existing contracts. Any district which has an existing contract with the Secretary as of October 12, 1982, which does not enter into an amendment of such contract as specified in subsection (a) of this section shall be subject to Federal reclamation law in effect immediately prior to October 12, 1982, as that law is amended or supplemented by sections 209 through 230 of this title [43 U.S.C.A. §§ 390ii to 390zz–1, 373a, 422e, 425b, 485h]. Within a district that *does not enter into an amendment of its contract with the Secretary within four and one-half years of October 12, 1982,* irrigation water may be delivered to *lands leased in excess of a landholding of one hundred and sixty acres only if full cost,* as defined in section 390bb(3)(A) of this title, is paid for such water as is assignable to those lands leased in excess of such landholding of one hundred and sixty acres: *Provided,* That the interest rate used in computing full cost under this subsection shall be the same as provided in section 390ee(a)(3) of this title.
(emphasis added).

districts that decline to exercise this option within the time prescribed may continue to receive water at the original contract price for delivery to land held in common ownership that does not exceed the 160–acre limit, but must pay "full cost" for any water delivered to *leased* landholdings of more than one hundred and sixty acres. All of the plaintiff Water Districts in this suit declined to amend their contracts and brought suit in federal court, claiming that the "hammer clause" violated the due process and taking clauses of the fifth amendment of the Constitution.[15]

## III

■ The first step in both due process and taking analyses is to determine whether there is a property right that is protected by the Constitution. *See, e.g., Bowen v. Public Agencies Opposed to Social Security Entrapment ("Public Agencies")*, 477 U.S. 41, 54–55, 106 S.Ct. 2390, 2397–98, 91 L.Ed.2d 35 (1986); *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958). In *Public Agencies*, a taking case, the Court held that the contractual right at issue "did not rise to the level of 'property' " and "[could] not be viewed as conferring any sort of 'vested right.' " 477 U.S. at 55, 106 S.Ct. at 2398. Without a property right, there could be no "taking within the meaning of the Fifth Amendment." *Id.* at 55–56, 106 S.Ct. at 2398.

The Water Districts maintain that as a result of the water contracts they have a constitutionally protected property interest in the delivery of subsidized water to leased tracts of any size. They claim that the hammer clause, section 203(b), violates this right by restricting the size of the leased tracts that can receive subsidized water.

■ There is no question that the federal government, "as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights." *Public Agencies*, 477 U.S. at 52, 106 S.Ct. at 2396–97 (citations omitted). Nonetheless, when interpreting the federal government's contractual agreements, we are guided by three paramount principles: First, " 'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless *surrendered in unmistakable terms.' " Id.* (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982) (emphasis added)). Thus, "contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." *Id.* at 52, 106 S.Ct. at 2397 (citations omitted). Second, governmental contracts "should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* at 52–53, 106 S.Ct. at 2397. Third, governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and our interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation. *See Darlington*, 358 U.S. at 87–88, 79 S.Ct. at 144.

With these principles in mind, we consider the Water Districts' claim to a vested contractual right to receive water at the subsidized rate to deliver to leased tracts of more than 160 acres. The Water Districts' argument in support of this right proceeds along two tracks. First, the Water Districts contend that because Congress did not include in the Act an express provision reserving to Congress the right to amend the reclamation law's eligibility requirements, Congress's right to amend the water service contracts is limited. Second, the Water Districts argue that absent an express reservation of the right to amend the contracts in the controlling legislation itself, we look only to the language of the contracts themselves. The Water Districts claim that their contracts must be interpreted (1) as giving them an implied right

15. The Water Districts do not make a claim under the contract clause, article I, section 10, of the Constitution. It is settled law that the contract clause applies only to the several states and not to the federal government. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 732 n. 9, 104 S.Ct. 2709, 2719 n. 9, 81 L.Ed.2d 601 (1984).

to deliver subsidized water to leased tracts of any size, and (2) as including an express waiver by Congress of its right to amend the contracts without the Water Districts' consent.

## A

■ We consider first the Water Districts' argument that Congress was required to reserve expressly the right to amend the reclamation law in the body of the statute itself. Although it is true that there is no express provision in the statutory scheme retaining Congress's ability to amend, alter or repeal the provisions of the Reclamation Act, this silence cannot be construed as a waiver of any of Congress's powers. The sovereign's power to enact subsequent legislation affecting its own contractual arrangements endures, albeit with some limitations, unless "surrendered in unmistakable terms." *Public Agencies*, 477 U.S. at 52, 106 S.Ct. at 2397.[16]

It is true that a line of cases, beginning with the *Sinking–Fund Cases*, 99 U.S. 700, 25 L.Ed. 496, 504 (1878), upholding legislation altering or repudiating the provisions of a government contract, has relied on the fact that the original statute included language reserving Congress's right to repeal, alter, or amend the act at any time. *Public Agencies*, 477 U.S. at 53–54, 106 S.Ct. at 2397; *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 467–69, 105 S.Ct. 1441, 1452–53, 84 L.Ed.2d 432 (1985); *Sinking–Fund Cases*, 99 U.S. at 720. As the Supreme Court explained in those cases: "Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments ... as come within the just scope of legislative power." *Sinking Fund Cases*, 99 U.S. at 720. However, nothing in those cases suggests that it is

an absolute requirement that Congress expressly reserve in the controlling statute the right to amend the statute or governmental contracts entered under it. Rather, in the *Sinking–Fund* line of cases, the express reservation was simply deemed dispositive of the plaintiffs' claims that Congress could not amend their contracts. There is no indication that the cases would have been decided differently had the statutes been silent on this issue. In light of the fundamental principle that Congress always has the power to amend, repeal or ignore legislation passed by earlier congresses, *see Manigault v. Springs*, 199 U.S. 473, 487, 26 S.Ct. 127, 133, 50 L.Ed. 274 (1905); *Sierra Club v. Froehlke*, 816 F.2d 205, 215 (5th Cir.1987); *Community–Service Broadcasting of Mid–America, Inc. v. Federal Communications Commission*, 593 F.2d 1102, 1113 (D.C.Cir.1978), we decline to read the *Sinking–Fund* line of cases as requiring that Congress expressly recite that it reserves the right to "repeal, amend or alter" legislation to preserve its fundamental right to do so. Finally, the recent statement by the Supreme Court that Congress must surrender its sovereign power "in unmistakable terms" before a court may find that Congress has yielded such power is entirely inconsistent with the requirement that Congress give notice in regulatory legislation that the regulations are subject to change. *Public Agencies*, 477 U.S. at 52, 106 S.Ct. at 2397.

## B

■ Nonetheless, we agree with the Water Districts that the absence of any express statement in the Reclamation Act of 1902 (and its amendments prior to 1982) requires us to examine the water service contracts to determine whether Congress surrendered in clear and absolute language

---

**16.** The exercise of the "reserved power" is not absolute. The Court has recognized that Congress's power in this respect " 'has a limit' in that Congress could not rely on that power to 'take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made.' " *Public Agencies*, 477 U.S. at 55, 106 S.Ct. at 2398 (quoting

*Sinking–Fund Cases*, 99 U.S. 700, 720, 25 L.Ed. 496, 504 (1878)). Similarly, Congress does not have "the power to repudiate its own debts, ... simply in order to save money." *Id.* at 55, 106 S.Ct. at 2398 (citing *Perry v. United States*, 294 U.S. 330, 350–51, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935); *Lynch v. United States*, 292 U.S. 571, 576–77, 54 S.Ct. 840, 842, 78 L.Ed. 1434 (1934)).

its right to impose express limitations on the size of leased tracts that could receive reclamation water.

We now address the Water Districts' argument that the contract language itself gives the Water Districts a vested right to deliver subsidized water to leased tracts of any size and contains an express waiver of Congress's power to amend the reclamation law in any way that interferes with that right. The specific contractual provisions that form the basis of the Water Districts' claim vary slightly in each contract. The following portions of the Lower Tule River Irrigation District water service contract, however, are exemplary of those provisions:

Article 2. This contract shall be effective from the date first hereinabove written and shall remain in effect for a period of forty (40) years....

Article 5(a). The contracting officer will, on or before February 15 of each calendar year, by written notice, notify the District of the rates of payment to be made by the District for all water to be delivered to it pursuant to this contract during the ensuing year, but in no event shall the rates so announced be in excess of three dollars and fifty cents ($3.50) per acre-foot for Class 1 water and one dollar and fifty cents ($1.50) per acre-foot for Class 2 water.

Article 7(f). The right to the beneficial use of water furnished to the District pursuant to the terms of Article 3 and other applicable provisions of this contract and any renewal thereof shall not be disturbed so long as the District shall fulfill all of its obligations under this contract and any renewal thereof.

Article 18(a). No water made available pursuant to this contract shall be furnished to any excess lands as defined in Article 20 hereof unless the owners thereof shall have executed valid recordable contracts in form prescribed by the United States....

Article 20(a). As used herein the term 'excess land' means that part of the irrigable land within the District in excess of one hundred and sixty (160) acres held in the beneficial ownership of any private individual, whether a natural person or a corporation.

Article 21. In the event that the Congress of the United States repeals the so-called excess-land provisions of the Federal reclamation laws, Articles 18, 19, and 20 of this contract will no longer be of any force or effect, and, in the event that the Congress amends the excess-land provisions or other provisions of the Federal reclamation laws the United States agrees, at the option of the District, to negotiate amendments of appropriate articles of this contract, all consistently with the provision of such repeal or amendment.

Excerpt of Record ("E.R.") Vol. IX, Tab 2, Exh. E.

The Water Districts claim that because Article 18(a) contains only one express restriction on the type of land that can receive project water, and that restriction applies only to land in excess of 160 acres held "in common ownership," their contracts with the Bureau give them an implied right to deliver water to farms of any size, as long as the farms are leased instead of owned. Thus, while acknowledging that they are expressly forbidden from delivering project water to forty acres of a 200 acre family-owned farm, the Water Districts contend that Articles 18(a) and 20(a), when read together, give them an implied right to deliver subsidized water to lands leased by large corporations that consist of hundreds of thousands of acres. As further support for their claim to an implied right to the water, the Water Districts point to Article 21's statement that "the United States agrees, at the option of the District, to negotiate amendments of appropriate articles of this contract," which the Water Districts construe as an express relinquishment by the United States of its ability to interfere with this implied right.

We read the contracts differently. The Water Districts concede, as they must, that the contracts do not expressly authorize the delivery of water to leased tracts. Instead, the Water Districts proceed on the theory that it is *implicit* in the terms of

their contract that they can provide reclamation water without limit to leased tracts and that Congress will not interfere with this implied right. On this basis, they claim to have a vested contractual right to continue to deliver subsidized water to leaseholds of any size, a right allegedly impaired by section 203(b). We take a different view. As the Supreme Court has stated when reviewing a similar claim to a vested right based on an implied contractual provision, the Water Districts' claim "lies in the periphery where vested rights do not attach." *Darlington*, 358 U.S. at 90, 79 S.Ct. at 146.

The Supreme Court considered and rejected a similar due process claim to an implied contractual right against the government in *Darlington,* and its analysis controls. *Darlington* involved another federal subsidy, a mortgage insurance program embodied in the 1942 National Housing Act, 56 Stat. 303, 12 U.S.C. § 1743, as amended by § 10 of the Veterans' Emergency Housing Act of 1946, 60 Stat. 207, 214, and the regulations issued thereunder. Congress enacted the program with the aim of making housing more accessible to veterans and their families. A corporation, which had entered into a federal contract to obtain mortgage insurance, rented apartments to transients, a use not *expressly* prohibited by the contract, controlling statute, or regulations promulgated thereunder. In fact, the only relevant requirement in force at the time the mortgage insurance contract was entered into was that the property be "designed principally for residential use." 358 U.S. at 85, 79 S.Ct. at 143 (quotation omitted). Five years later, Congress enacted legislation expressly barring the rental of such housing units to transients. The corporation sued, asserting that the amendment amounted to an unconstitutional infringement of its contractual rights.

To determine whether a right to rent to transients could fairly be *implied* in the contracts, the Court turned to the legislation that had authorized the contracts. Review of the controlling statute, the National Housing Act, convinced the Court that the "legislation [was] passed to aid veterans and their families, not ... to promote the hotel or motel business." *Id.* at 87, 79 S.Ct. at 144 (footnote omitted). Congress's intention that the mortgaged properties be rented only as permanent dwellings pervaded the Committee reports and other legislative history, although the requirement was never made expressly. Because the legislative purpose of the Act was to provide permanent homes for families, and in particular, for veterans and their families, the Court declined to hold that the plaintiff had an implicit right to engage in conduct that did not serve that purpose. The Court rejected the argument advanced by the dissent that Darlington's contract gave it a vested right to make rentals to any persons and in any manner that was not expressly prohibited by the statute or contract. *Id.* at 95, 79 S.Ct. at 147 (Harlan, J., dissenting). Instead, the Court concluded that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.* at 91, 79 S.Ct. at 146. By passing legislation barring rentals to transients, Congress was simply making explicit the policy underlying the legislation, thus "doing no more than protecting the regulatory system which it had designed." *Id.*

The similarities between the Water Districts' claim in this case and the claim rejected in *Darlington* are striking. The Water Districts contend that because they were not expressly prohibited by the Department in their contracts from providing water to leased land, they have a contractual right to do so which must be considered "vested" or immune from later regulations or statutory amendments. This argument was squarely rejected in *Darlington* as insufficient ground on which to base a claim to a vested right.

As in *Darlington,* the implied right asserted here clearly violates the spirit, if not the letter, of the reclamation laws which authorized such contracts. The reclamation projects were funded by the federal government with the express intent that the subsidized water be used to promote the development of family-owned farms. *See* discussion, *supra,* at pp. 802–803. Prior to the RRA, Congress had always required that land receiving reclamation wa-

ter be owned in no larger than 160–acre parcels *and* that the owners of the land occupy it or reside in the neighborhood. The fact that the Department of the Interior ignored the residency requirement and turned a blind eye to the practice of large-scale leasing does not lessen the importance of these restrictions in the congressional scheme. Nor did the Department's lax enforcement policy over the years remove the ever-present possibility that Congress would buttress the reclamation laws "by subsequent amendments to achieve [its original] legislative end." *Darlington,* 358 U.S. at 91, 79 S.Ct. at 146.[17]

In sum, the fact that the reclamation laws had as their *end* the dismantling of large landholdings in the West and the redistribution of that land to families, effectively undercuts the Water Districts' argument that they were given an implied right to deliver the water to farms regardless of size, as long as the land was not actually *owned* by the operator of the farm. To find a vested contract right with these facts, we believe, would seriously impair Congress's sovereign power to pass laws for the public welfare. Were we to accept the Water Districts' argument, parties that enter into contracts with the government pursuant to such legislation could claim vested rights to engage in all conduct not expressly forbidden in the contracts. We do not believe that Congress must exhaustively proscribe conduct in a regulated field to prevent parties from claiming an "implied vested right" to engage in conduct found by later Congresses to be harmful to the public welfare.

Our rejection of the Water Districts' claim to a vested contract right finds further support in the Supreme Court's decision in *Public Agencies.* In that case, California and several of its public agencies brought suit against the United States, alleging a taking in violation of the fifth amendment as a result of a 1983 amend-

ment to the Social Security Act, repealing a state's right to terminate its participation in the Social Security system. Because California had previously entered into an agreement with the federal government, which expressly provided that California could withdraw from the system, California claimed that section 418(g), as amended, amounted to a repudiation by the government of its contractual obligations.

The Supreme Court rejected this argument, reasoning:

> The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in § 418 itself. The provision constituted neither a debt of the United States, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium. The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

477 U.S. at 55, 106 S.Ct. at 2398 (citations omitted).

If anything, California had a greater claim to a vested right in *Public Agencies* than do the Water Districts in this case because in *Public Agencies* the federal government had incorporated in an agreement with the states an express promise that they could withdraw from the social security system. Nonetheless, the Court held that the contracts created no interests that were entitled to protection under the taking clause of the fifth amendment.

## C

■ There is still an additional reason for not finding an implied vested right in

---

**17.** The actions of the Department of the Interior are relevant, if at all, to an equitable estoppel claim against the United States. Although we express no opinion as to whether equitable estoppel could be invoked in this case because the Water Districts do not appeal the district court's dismissal of their estoppel claim, we note that

equitable estoppel is infrequently applied against the government and then only in cases where there is "affirmative misconduct" by the government. *Wagner v. Director, Fed. Emergency Management Agency,* 847 F.2d 515, 519 (9th Cir.1988) (quotation omitted).

the Water Districts' contracts. The contracts contain no language that can be construed as a "surrender[ ] in unmistakable terms" of the sovereign's ability to regulate the quantity of subsidized water that may be provided to leased farm lands. *Public Agencies*, 477 U.S. at 52, 106 S.Ct. at 2397. Article 21, which the Water Districts claim is a clear waiver of the federal government's sovereign power, cannot be so interpreted, especially if we follow the Supreme Court's dictate that governmental contracts "should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* at 52–53, 106 S.Ct. at 2397.

Article 21 has two primary clauses. The first states that if Congress were to repeal the excess land provisions of the federal reclamation law, then the contracts would be modified automatically to eliminate related provisions in the contract. The second clause of Article 21 provides that if Congress *amends* the excess land provisions or any other aspect of the reclamation law, the contracts will be modified "consistently with the provisions of such ... amendment," and "at the option of the District."

The Water Districts argue that these two clauses of Article 21 make the contracts inviolable, absent a negotiated amendment between the parties. They claim that the two clauses "expressly deprive the United States of the power to make subsequent amendments of the law applicable to the contracts." Appellants' Opening Brief at 29. We read Article 21 differently.

In our view, the clause granting the Districts the option of renegotiating their contracts cannot reasonably be interpreted as a "surrender[ ] in unmistakable terms" of the sovereign's power to make changes in the federal reclamation laws. *Public Agencies*, 477 U.S. at 52, 106 S.Ct. at 2397. Such an interpretation would do violence to the principle that government contracts should be construed, whenever possible, "to avoid foreclosing exercise of sovereign authority." *Public Agencies*, 477 U.S. at 53, 106 S.Ct. at 2397. In light of this principle, we believe that a more reasonable interpretation of Article 21 is that it grants the Water Districts the option of renegotiating the terms of their contracts to conform to Congress's amendments to

the excess land provisions of the reclamation law. This option does not, however, give the Water Districts the right to continue to receive reclamation water under the terms of the pre-existing contracts if those terms violate the newly amended law.

As we read Article 21, the Water Districts have a choice between renegotiating their contracts to bring them into conformity with the new law or withdrawing from the reclamation program. In other words, the Water Districts have the option of continuing to receive reclamation water but only under the terms of the new law. Thus, they can continue to receive and deliver water to holdings up to 160 acres, whether owned or leased, at the low price specified in their pre-existing contracts, but they cannot continue to deliver water at the old price to holdings in excess of 160 acres.

Although we acknowledge that the language of Article 21 is not entirely clear as to its intended meaning, we believe that our reading of the ambiguous language is the only one that is reasonable in light of the Supreme Court's command that we interpret government contracts, whenever possible, to avoid foreclosing the exercise of sovereign authority. We also believe that our interpretation is reasonable in light of Article 21's own requirement that in the event of congressional amendment of the federal reclamation law, the Water Districts' actions must be "consistent[ ] with the provision of such repeal or amendment."

### D

■ The Water Districts urge yet another line of reasoning in their effort to establish a vested property right in the contracts. They argue that they have a "reasonable investment-backed expectation" to receive water at subsidized rates and that this expectation amounts to a property interest that is protected by the fifth amendment. They claim that their expectation of subsidized water was reasonable based upon the statutes then in effect and upon the representations "made by the United States during the negotiation, drafting, and execution of the water service contracts."

Appellants' Opening Brief at 36. They also point to the investments that the Water Districts and property owners made, in reliance upon these representations, statutes, and contracts, and claim that section 203(b) destroys their reasonable expectation that they would continue to receive subsidized water for lands leased in excess of 160 acres.[18]

The Water Districts offer no authority for the proposition that a constitutionally protected property interest can be spun out of the yarn of investment-backed expectations. Their reliance upon *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) for this argument is misplaced. *Ruckelshaus* is authority for the proposition that once a constitutionally protected property interest is established, then a reasonable investment-backed expectation is one of several factors to be taken into account "when determining whether a governmental action has gone beyond 'regulation' and effects a 'taking.'" 467 U.S. at 1005, 104 S.Ct. at 2874. Whether a "taking" has occurred is the second step of the inquiry. Here, we do not reach that step because the Water Districts have failed to survive the first step, which is establishing that a property right exists. Thus, the Water Districts' reliance on *Ruckelshaus* is misplaced, leaving them with no support for the curious proposition that investment-backed expectations can give rise to a constitutionally protected property interest.

**E**

■ In sum, because the Water Districts have no vested property right to buy reclamation water for delivery to leased lands, the restrictions imposed by section 203(b) do "not effect a taking within the meaning of the Fifth Amendment." *Public Agencies*, 477 U.S. at 56, 106 S.Ct. at 2398. For the same reason, the Water Districts' due process claim also must fail. *See Darlington*, 358 U.S. at 91, 79 S.Ct. at 146 ("The Constitution is concerned with practical, substantial rights, not with those that are unclear and gain hold by subtle and involved reasoning."). In the absence of a vested property right, the Water Districts can prevail on their due process claim only if they establish that section 203(b) is arbitrary and irrational. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984). This they have failed to do.

■ We agree with the district court that section 203(b) of the Reclamation Reform Act is rationally related to a legitimate governmental purpose. The provisions of the Act, and its legislative history,[19] clearly demonstrate that Congress's primary concerns were not with the federal budget,[20] but rather, with the promotion of small farming operations, equitable distribution of water under modern farming conditions, and water conservation. *See* Section II *supra* at pp. 802–807.

To these ends, Congress increased the size of farms that could receive reclamation water to 960 acres (whether leased or owned) and raised the price of reclamation water to reflect more accurately its true cost to the government. Section 203(b) authorized the Water Districts to amend their contracts to take advantage of the 960-acre limitation, albeit at a potentially higher, but still subsidized, rate than that provided in their contracts. The Water Districts were not required to amend their contracts because any water district that

---

**18.** Once again, the Water Districts' argument takes on the flavor of an equitable estoppel claim against the government. *See supra* note 17, at 811.

**19.** *See, e.g.,* 128 Cong.Rec. 8809 (1982) (statement of Rep. Clausen) ("The hope of the committee is that upward revision of the acreage limitation will enhance the economic viability and productivity of the modern family farm...."); H.R.Rep. No. 458, 97th Cong., 2d Sess. 34 (1982) (statement of Rep. Miller) (Reforms "will reduce unjustified taxpayer subsi-

dies to large scale farmers while preserving benefits to the intended beneficiaries of the Reclamation program—the small farmer.").

**20.** The due process clause prevents Congress from "repudiat[ing] its own debts ... simply in order to save money" and also from modifying an existing contract to which the United States is a party if the legislation deprives the other party of contract benefits "actually reduced to possession." *Public Agencies*, 477 U.S. at 55, 106 S.Ct. at 2398 (quotations omitted). Neither exception is applicable here.

wanted to maintain the 160–acre limitation and lower contract price was left free to do so. Section 203(b), the so-called hammer clause, simply provided that those who elected to continue under the original contracts could no longer continue to deliver subsidized water to leased tracts of any size. Section 203(b) requires the Water Districts to choose between continuing under previous federal water policy, but without the "leasing loophole" tolerated by the Department of the Interior, or conforming with the new 960–acre limitation of the RRA. In our opinion, section 203(b) is a reasonable way for Congress to further its federal reclamation policy of promoting small farming operations, equitable distribution of water, and water conservation.

The summary judgment in favor of the government and the Natural Resources Defense Council is

AFFIRMED.