

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-14-2003

# Lukwago v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket 02-1812

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Lukwago v. Atty Gen USA" (2003). *2003 Decisions.* Paper 507.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/507

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1812

BERNARD LUKWAGO
a/k/a MELVIN HAFT,
*Petitioner*

v.

JOHN ASHCROFT,
Attorney General of the United States,
*Respondent*

Petition for Review of an Order
of the Board of Immigration Appeals
(A78-420-780)

Argued December 17, 2002

Before: SLOVITER, RENDELL, and GREENBERG,
*Circuit Judges*

(Filed: May 14, 2003)

Danielle E. B. Lehman (Argued)
Orinda, CA 94563

Jennifer J. Kramer
West Chester, PA 19382

  Attorneys for Petitioner

Robert D. McCallum, Jr.
  Assistant Attorney General Civil
  Division
Linda S. Wendtland
  Assistant Director
John C. Cunningham (Argued)
  Senior Litigation Counsel
Michael P. Lindemann
John M. McAdams, Jr.
United States Department of Justice
Office of Immigration Litigation
Washington, DC 20044

  Attorneys for Respondent

-----

## OPINION OF THE COURT

-----

SLOVITER, *Circuit Judge*.

## I.

### INTRODUCTION

Bernard Lukwago petitions for review of the decision of the Board of Immigration Appeals ("BIA") ordering his deportation after denying his application for asylum, application for withholding of removal under the Immigration and Nationality Act ("INA") and request for withholding of removal under Article 3 of the United Nations Convention Against Torture ("CAT"). For the reasons set forth hereafter, we will deny the Petition for Review on some claims and remand to the BIA on other claims for further proceedings consistent with this opinion.

## II.

## FACTS AND PROCEDURAL HISTORY

Lukwago is a native and citizen of Uganda. He lived with his parents on farmland in a village in the Gulu District of Northern Uganda. He testified before the Immigration Judge ("IJ") that in August 1997, when he was 15 years old, rebels from the Lord's Resistance Army ("LRA"), a rebel force that opposes the Ugandan government, attacked his home and killed his parents. Certified Administrative Record ("C.A.R.") at 199-200. The rebels captured Lukwago, tied his hands, and took him, along with three other persons from his village, to the LRA camp. C.A.R. at 201-02, 254. While at the camp, Lukwago stayed in a tent with other kidnapped children where they were guarded by armed rebels. C.A.R. at 203-04. Both adults and children were held captive at the camp. C.A.R. at 220-21.

Because the BIA found no reason to challenge Lukwago's credibility we accept his recitation of the facts as given in his affidavits and testimony. *See Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir. 1994) ("Absent an explicit finding that a specific statement by the petitioner is not credible we are required to accept her testimony as true."). Lukwago testified that the rebels forced him to perform manual labor. He was ordered to get water and firewood. C.A.R. at 205. The rebels also trained him to shoot a gun, while threatening to beat him for poor performance. C.A.R. at 218. Once trained, Lukwago and other captives were forced to fight with the rebels against government soldiers. C.A.R. at 205-06. Lukwago was forced to fight on the front line shooting at government soldiers. C.A.R. at 205-06. He participated in at least 10 battles. C.A.R. at 221, 223. After the fighting, Lukwago and other captive children were ordered to remove uniforms and weapons from dead soldiers. C.A.R. at 205. He also accompanied the rebels on attacks against civilian villages where he was required to carry stolen food and animals back to camp. C.A.R. at 229-30. In addition, during the attacks Lukwago frequently witnessed rebels torture civilians by cutting their lips and fingers. C.A.R. at 230.

Lukwago testified that he was threatened he would be killed if he tried to escape. C.A.R. at 204-05. He witnessed the shooting of two captive children who failed in their attempt to escape. C.A.R. at 265. After one rebel battle, Lukwago and Joseph, his friend at the camp, were carrying stolen weapons and uniforms back to the camp. C.A.R. at 208. Joseph became too tired to keep marching and the rebels beat him, but he was unable to continue. C.A.R. at 208. Lukwago testified that the rebels forced him to help place a heavy rock on Joseph's chest and to sit on the rock until his friend stopped breathing. C.A.R. at 208-11. Lukwago escaped two weeks later while collecting firewood. C.A.R. at 211-12. In total, Lukwago was held captive for approximately four months. App. at 5.

After escaping, Lukwago went to his uncle's home where he stayed for 10 days. C.A.R. at 213-15. His uncle made arrangements for Lukwago to flee Uganda, providing Lukwago with a Ugandan passport and a German visa. C.A.R. at 215. He fled with the false passport to Germany where he purchased a ticket to Holland. C.A.R. at 215, 234. Lukwago traveled to Amsterdam the following day and applied for asylum. C.A.R. at 215, 236. After two years in the Netherlands, his application was denied. C.A.R. at 238. Soon after notification of the denial, he met Melvin Haft in Rotterdam. He testified that "I was on the street. I was crying. Then my, one man he see me, ask me my problem. . . . He was Haft Melvin Sirada (phonetic sp.)." C.A.R. at 242-43. Haft, who had a passport from Holland, was from Suriname. C.A.R. at 243. Lukwago stayed with Haft for two weeks before Haft took him to Belgium. C.A.R. at 243. Haft and Lukwago then traveled to Madrid, Spain where Haft provided Lukwago a passport and an airplane ticket to the United States, each in Haft's name. C.A.R. at 243-45.

Lukwago arrived in the United States on November 22, 2000. C.A.R. at 1028. He requested asylum based on past persecution by the LRA and fear of future persecution by both the LRA and the Ugandan government if returned to Uganda. C.A.R. at 978, 987.

On August 17, 2001, the IJ issued a decision and order denying Lukwago's application for asylum and withholding of removal under INA § 241(b)(3). AV1 at 14-28 (IJ's

Decision and Order).[1] The IJ found that Lukwago's testimony was not credible based on his mannerisms before the court and "certain inconsistent and unpersuasive testimony the extent of which cast[ed] doubt on the veracity of his claim." AV1 at 19. Specifically, the IJ found Lukwago not credible due to inconsistencies between his testimony before the IJ and previous statements and testimony, including a Dutch asylum interview,[2] and the implausibility of his descriptions of his participation in LRA battles. AV1 at 21-23. Nonetheless, the IJ granted Lukwago's request for withholding of removal under the CAT. AV1 at 27. The IJ found, based on expert testimony and the Department of State's special Advisory Opinion, that Lukwago "stands the likelihood of being subjected to torture by the [Ugandan government] upon his return," especially given the evidence that former child soldiers are punished, detained in pits, and used to clear minefields. AV1 at 26-27.

Both Lukwago and the INS appealed the IJ's decision. The BIA, in a decision dated February 21, 2002, reversed the IJ's adverse credibility finding because it lacked sufficient support. AV1 at 5-7 (BIA Decision). The BIA found that the IJ's reliance on the Dutch asylum interview was improper because the documents were "not properly certified or authenticated." AV1 at 5. In addition, the BIA did not find Lukwago's descriptions of the LRA battles troublesome because "it would be unreasonable to expect a high degree of detail regarding battle conditions from a young man who was only 15 years old . . . and who had been assessed as suffering from post-traumatic stress disorder []." AV1 at 6 (footnote omitted). Finally, the BIA did not agree with the IJ's finding that Lukwago's descriptions of his village and school were not credible. The BIA stated those descriptions were not central to his claim and were not necessarily in conflict with expert evidence on

---

1. AV1 is the designation given by petitioner for the Appendix attached to his brief, which is to be distinguished from the separate Appendix also provided.

2. Lukwago submitted an affidavit to the IJ explaining that there were some inconsistencies because the Dutch interview was conducted in English, a language he spoke poorly at the time, and his request for a Ugandan translater had been denied. C.A.R. at 412.

the topic. AV1 at 7. The INS does not challenge the BIA's credibility finding in the current appeal.

Despite its acceptance of Lukwago's credibility, the BIA dismissed Lukwago's appeal and sustained the INS' appeal, thereby denying Lukwago's asylum application, his request for withholding of removal under INA § 241(b)(3), and his request for protection under the CAT. The BIA held that Lukwago failed to satisfy his burden of establishing that he suffered past persecution or had a well-founded fear of future persecution by the LRA or the Ugandan government on account of his race, nationality, religion, membership in a particular social group, or political opinion. AV1 at 7-9. The BIA stated that Lukwago did not contend that his treatment by the LRA was on account of his race, nationality, political opinion or religion. It continued:

> We therefore must look to whether he established his membership in a "particular social group," and that he was targeted for persecution based on his membership in that group. The only defining characteristic of this group that the respondent has provided is age, *i.e.* all persons under the age of 18. Although the evidence indicates that the LRA does harm children, the respondent has failed to demonstrate that he was targeted by the LRA because he was a child.

AV1 at 8. It also declined to find that Lukwago faces a heightened risk of future persecution by the LRA or the Ugandan government as a former LRA child soldier. AV1 at 8-9.

The BIA denied Lukwago's application for protection under the CAT because Lukwago failed to demonstrate that he is likely to be tortured by the Ugandan government if he returns to Uganda. For this holding, the BIA relied on the Ugandan government's amnesty policy for former rebels. AV1 at 9. With regard to the required showing of torture by the LRA, the BIA found that (1) he presented no evidence to show that the LRA attempts to seek out and harm "those who have previously deserted from their ranks" and (2) the CAT does not extend protection to torture by entities that are beyond the government's control. AV1 at 10.

The BIA ordered Lukwago's deportation to Uganda. Cecelia M. Espenoza, Board Member, concurred in part and dissented in part with the BIA decision.[3] AV1 at 11. Lukwago filed a timely Petition for Review.

## III.

### JURISDICTION AND STANDARD OF REVIEW

The BIA had jurisdiction to review the IJ's decision under 8 C.F.R. § 3.1(b). We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). We have previously stated that "because the BIA has the power to conduct a *de novo* review of IJ decisions . . . the 'final order' we review is that of the BIA." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001).

We must review the BIA's statutory interpretation of the INA under the deferential standard of *Chevron U.S.A. v. Natural Res. Def. Counsel*, 467 U.S. 837 (1984). In *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993), we stated, " '[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.' " *Id.* at 1239 (quoting *Chevron*, 467 U.S. at 843).

On the other hand, we must treat the BIA's findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). In *Abdille v. Ashcroft*, we held that " 'persecution' and 'well-founded fear of persecution' are all findings of fact that we review under the deferential

---

3. Board Member Espenoza concurred in the majority's reversal of the IJ's adverse credibility finding and in the majority's finding that Lukwago did not establish that he was a member of a "particular social group." AV1 at 11. However, she dissented in part because she found that Lukwago was "likely to have an anti-government political opinion imputed to him," and would have remanded for further consideration of whether Lukwago had a well-founded fear of persecution on account of that imputed political opinion. AV1 at 11. She also disagreed with the majority's rejection of Lukwago's request for withholding of removal under the CAT. AV1 at 11.

substantial evidence standard" and the BIA's findings must be upheld "unless the evidence not only supports a contrary conclusion, but compels it." 242 F.3d 477, 483-84 (3d Cir. 2001). We will reverse "only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed." *Id.* at 484 (citation omitted).

## IV.

## DISCUSSION

Lukwago challenges the BIA's decision denying his applications for asylum, withholding of removal under INA § 241(b)(3), and withholding of removal under the CAT. In considering Lukwago's petition, we must give his testimony the benefit of the BIA's acceptance of his credibility. *See supra* p. 5. On appeal, the INS does not challenge Lukwago's testimony.

## A.

## APPLICATION FOR ASYLUM

Congress established a new statutory procedure for granting asylum to refugees with the enactment of the Refugee Act of 1980. That Act added a new section 208(a), now section 208(b), to the INA which gave the Attorney General discretion to grant asylum to an alien who meets the burden of showing that s/he qualifies as a "refugee" under INA § 101(a)(42)(A). *See Abdille*, 242 F.3d at 482. The INA defines a refugee as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

Thus, a refugee may be one who suffered past persecution on account of one of the enumerated grounds or fears future persecution on account of one of those grounds. Lukwago contends that he qualifies as a refugee because he was persecuted on account of his membership in the "particular social group" of children from Northern Uganda who are abducted and enslaved by the LRA and oppose their involuntary servitude. Pet.'s Br. at 14. He also claims that he has a well-founded fear of future persecution by the LRA or the Ugandan government on account of his membership in the "particular social group" of former child soldiers who have escaped LRA enslavement or on account of imputed political opinions. Pet.'s Br. at 26.

**1.**

## PAST PERSECUTION

To qualify for asylum based on past persecution, the applicant first must show that s/he suffered persecution. Persecution "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin*, 12 F.3d at 1240. Rather, we have defined persecution as including "threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom." *Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001) (citation omitted).

The BIA did not deny that Lukwago was persecuted by the LRA and Lukwago's testimony was graphic on that score. Lukwago witnessed the LRA murder his parents:

> Q. The night that your parents were killed, what happened first?
>
> A. The rebels come and they start to kick the door and start shooting. And then my parents, they opened the back door and then when we start to run, the rebels, they shoot my parents.

C.A.R. at 200.

He was abducted from his home and was held captive against his will:

Q. And what happened after your parents were shot?

A. The rebels, they take me.

Q. And how did the Lord's Resistance Army take you? How did they force you to go with them?

A. They tie me on the rope, on the hand with other three people and then they take us to the camp.

C.A.R. 201; App. at 5.

The LRA forced him to perform manual labor using threats of physical harm. He testified,

We had to fetch water, to fetch firewood and also when we go to fight, they also give us the gun and they put us in the front and, and we go to fight. Also when we fight, they tell us to, to remove the uniform from the dead soldiers. The uniform and the, and the gun and the shoes.

C.A.R. at 205.

He was repeatedly threatened and was beaten on more than one occasion for failing to adhere to LRA orders. C.A.R. at 206-07, 218-19. Lukwago was exposed to the killing and physical torture of his fellow captives, innocent civilians, and government soldiers. C.A.R. at 205-06, 229-30, 265. He stated,

We steal those people's food, their animals, bombing their houses and sometimes the rebels, they cut the people's, the people's lips like this here. This and sometime they, their fingers.

C.A.R. at 230.

Moreover, he was forced to place his life in jeopardy in battles against government forces. C.A.R. at 205-06. He was subjected to all of this physical and psychological abuse as a mere 15 year old boy. He was confined against his will for four months, only to escape in the face of a significant risk of death. There could be no question that the LRA's treatment of Lukwago "constitute[d] a real threat to [his] life or freedom." *Lin*, 238 F.3d at 244.

The INS argues that forced military conscription does not constitute persecution. Lukwago responds that the INS did

not raise this argument in the proceedings before the agency, and we see nothing in either the IJ's opinion or that of the BIA to suggest to the contrary. Nonetheless, we will consider the INS' argument but we do not find it persuasive, in large part because the authority on which the INS relies is inapplicable to Lukwago's situation.

It is generally accepted "that a sovereign nation enjoys the right to enforce its laws of conscription, and that penalties for evasion are not considered persecution." *M.A. v. United States INS*, 899 F.2d 304, 312 (4th Cir. 1990) (*en banc*). We cited the *M.A.* opinion in *Chang v. INS*, 119 F.3d 1055, 1060 (3d Cir. 1997), as an example of cases which rejected the notion that the fear of violating generally applicable laws does not constitute persecution. In *M.A.*, the conscription at issue was by the government in power to serve in its armed forces. We also are not inclined to suggest that a government that drafts its citizens for military service engages in persecution. After all, this country has, until recently, partially filled its armed services through the draft and may decide to do so in the future.

Conscription into service by guerrillas engaged in attacks on the established government is an entirely different matter. Lukwago did not violate a legitimate conscription requirement established under Ugandan law. Instead, he was forcibly abducted by a guerrilla organization that was mounting attacks against the established government.

The INS cites the Supreme Court decision in *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), to support its position that forcible conscription by a guerrilla organization, in and of itself, is not persecution "on account of" a protected characteristic within the meaning of the INA. It argues that "[t]he political aims of the guerrilla force are not enough to compel a finding that the forced recruitment was a political act, or that resistance to being kidnaped was an expression of political opinion, or that threats and violence in retaliation for resistance or escape were politically motivated." Resp. Br. at 38 (citing *Elias-Zacarias*, 502 U.S. at 481-83).

The record in *Elias-Zacarias* was much different than that presented here by Lukwago. In *Elias-Zacarias* the petitioner

sought asylum after one instance in which two armed uniformed guerrillas asked him and his parents to join with them, and told them they would be back after they refused the guerrillas. The Supreme Court majority held that a guerrilla organization's attempt to coerce a person into performing military service does not necessarily constitute "persecution on account of . . . political opinion," *id.* at 479, and upheld the determination of the BIA to deny asylum. Significantly, Elias-Zacarias was not forcibly conscripted, only asked to join the guerrillas. There is nothing in the Supreme Court opinion to suggest that forced conscription by a guerrilla organization cannot constitute persecution. Instead, the Court held that Elias-Zacarias failed to demonstrate that such persecution, if any, was on account of his political opinion or any other protected ground. *Id.* at 481-83. Even if forced conscription by a guerrilla organization alone would not qualify a victim for asylum that does not mean that, in appropriate circumstances, it cannot constitute persecution.

The Court of Appeals for the Fourth Circuit, in its opinion holding that penalties for draft evasion are not considered persecution, excepted the situation where "refusal to serve in the military results not in normal draft evasion penalties, but rather in disproportionately severe punishment. . . ." *M.A.*, 899 F.2d at 312. It would be anomalous to consider Lukwago's enslavement to be "punishment" under this exception but it was certainly not less than "disproportionately severe punishment" for refusal to serve. Lukwago provided testimonial and documentary evidence that the LRA kills abducted child rebels who attempt to escape. In fact, Lukwago witnessed the killing of at least two children who unsuccessfully attempted to escape LRA confinement. The threat of death is not a normal draft evasion penalty and, once again, we can conceive of no reasonable factfinder who would not agree that it qualifies as persecution.

Moreover, Lukwago's persecution by the LRA was not limited to forced military service. He also endured physical and psychological abuse. He was forced to kill his friend, to watch the murder of his parents, and to view the mutilation of innocent civilians. Thus, to the extent that the BIA

rejected Lukwago's claim of past persecution because it equated forced captivity with conscription into a government's armed services, it erred as a matter of law. Lukwago's confinement and treatment by the LRA may constitute persecution under the INA.

But a demonstration by Lukwago of past persecution would not be enough to qualify him for asylum. As the BIA correctly stated, an applicant has the burden of showing that the persecution was *on account of* the applicant's race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(b)(1); *see Elias-Zacarias*, 502 U.S. at 481-83 (applicant must show some evidence that persecution due to one of the enumerated grounds). When determining if an applicant has suffered persecution on account of protected grounds, we must look beyond the applicant's conduct to the persecutor's motives. *Chang*, 119 F.3d at 1063. As the Supreme Court explained in *Elias-Zacarias*, the INA "makes motive critical," and therefore, although an applicant is not required to provide direct proof of his persecutor's motives, "he must provide *some* evidence of it, direct or circumstantial." 502 U.S. at 483 (emphasis in original). A persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds. *See Chang*, 119 F.3d at 1065 (finding persecution on account of political opinion where persecutor's action was "motivated, at least in part" by the applicant's political opinion). The BIA held that Lukwago failed to show that the LRA persecuted him based on any of the statutorily enumerated grounds. AV1 at 8.

Lukwago does not argue that the LRA persecuted him because of his race, religion or nationality, and he failed to demonstrate that the LRA's past abduction and persecution of him was on account of his political opinions. He does not argue in his brief that he opposed the LRA movement or its political opinions prior to his abduction. In *Elias-Zacarias*, the Supreme Court held that persecution of persons refusing to join guerilla forces was not persecution on account of political opinion where the guerrillas were motivated solely by their need to fill their ranks. 502 U.S.

at 482-83. Similarly, Lukwago has not shown that his abduction and persecution by the LRA was motivated by any reason other than the LRA's need for additional labor and soldiers.

Instead, Lukwago contends that he was persecuted because of his membership in a "particular social group," the only protected ground remaining. In *Fatin*, this court laid out the three requirements to qualify for asylum on account of membership in a "particular social group": (1) the applicant must identify a group that constitutes a "particular social group;" (2) the applicant must establish that s/he is a member of that group; and (3) the applicant must show that s/he was persecuted based on that membership. 12 F.3d at 1240.

The contours of what constitutes a "particular social group" are difficult to discern. We have noted that the "statutory language standing alone is not very instructive" and that, "in its broadest literal sense, the phrase is almost completely open-ended." *Id.* at 1238. We stated that "[b]oth courts and commentators have struggled to define 'particular social group.'" *Id.* (footnotes omitted). Moreover, the legislative history of the INA fails to "shed[] much light on the meaning of the phrase 'particular social group.'" *Id.* at 1239. However, given the ambiguity of the language, our role is limited to reviewing the BIA's interpretation, using *Chevron* deference to determine if it is a "permissible construction of the statute." *Id.* (citation omitted).

The Courts of Appeals have varied in their interpretations of the phrase. For example, the Ninth Circuit has defined a "particular social group" as entailing a "voluntary associational relationship" among its members. *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986). That court rejected a claim that "young, urban, working class males of military age who had never served in the military" qualified as a "particular social group," and held instead that the phrase "implies a collection of people closely affiliated with each other, who are actuated by some common impulse or interest." *Id.* at 1573, 1576. On the other hand, the Second Circuit has construed a "particular social group" as "individuals who possess some fundamental characteristic in common which serves to

distinguish them in the eyes of a persecutor." *Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991). That court focused on whether members of the group share a "recognizable and discrete" characteristic. *Id.*

We analyzed the meaning of a "particular social group" in *Fatin.* Giving proper deference to the BIA, we accepted the definition for a "particular social group" developed by the BIA in *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled in part as stated in Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). In *Acosta*, the BIA reasoned that a "particular social group" refers to "a group of persons all of whom share a common, immutable characteristic." *Id.* The BIA then noted that "whatever the common characteristic that defines the group, it must be one that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.*

The Courts of Appeals of the First Circuit and the Seventh Circuit also have endorsed the *Acosta* definition. *See Ananeh-Firempong v. INS*, 766 F.2d 621, 626 (1st Cir. 1985) (The alleged facts "show that the threat of persecution arises out of characteristics that are essentially beyond the petitioner's power of change."); *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998) ("[w]e believe that the best approach is to accept the formulation [of a particular social group] proposed by the BIA in *Acosta*").

Lukwago asserts that he is a member of the "particular social group" of children from Northern Uganda who are abducted and enslaved by the LRA and oppose their involuntary servitude. The BIA rejected Lukwago's proffered social group on two grounds. First, the BIA seemed to question whether a group based on age may qualify as a "particular social group." AV1 at 8. Second, even if age is a "particular social group," the BIA found that the LRA did not target Lukwago because of his age. AV1 at 8.

It is undeniable that youth is an important component of a child's identity. Children share many general characteristics, such as innocence, immaturity, and impressionability. However, unlike innate characteristics, such as sex or color, age changes over time, possibly

lessening its role in personal identity. Moreover, children as a class represent an extremely large and diverse group, and children, even within a single neighborhood, have a wide degree of varying experiences, interests, and traits. *See Gomez*, 947 F.2d at 664 ("Possession of broadly-based characteristics such as youth and gender will not by itself endow individuals with membership in a particular group.").

Lukwago contends that the BIA erred by not considering the limitation in his proffered social group, i.e. those "children from Northern Uganda who are abducted and enslaved by the LRA and oppose their involuntary servitude to the LRA." Pet's Br. at 14. The INS counters that a social group cannot be created by the alleged underlying persecution. We agree that under the statute a "particular social group" must exist independently of the persecution suffered by the applicant for asylum. Although the shared experience of enduring past persecution may, under some circumstances, support defining a "particular social group" for purposes of fear of future persecution, it does not support defining a "particular social group" for past persecution because the persecution must have been "on account of" a protected ground. INA § 101(a)(42)(A). Therefore, the "particular social group" must have existed before the persecution began.

Lukwago offered testimonial and documentary evidence that the LRA targets children for abduction. He argues that the LRA's choice to kill his parents but abduct him shows that the LRA targets children. He also submitted an Amnesty International report which stated that, for the LRA, "[t]aking children is a systematic choice: most of those abducted are between 13 and 16 years old. Younger children are generally not strong enough to carry weapons or heavy loads while older children are less malleable to the will of their abductors." C.A.R. at 820 (Amnesty International, "Uganda: 'Breaking God's Commands': the destruction of childhood by the Lord's Resistance Army," 18 Sept. 1997). In addition, Dr. Susan Dicklich, an expert witness,[4] who verified the LRA practice of abducting

---

4. Dr. Dicklich, who has traveled to Uganda as an affiliate of the Mack Curry Institute for Social Research, has written on the country and its conditions. App. at 78-79. The INS did not object to her expertise. App. at 77.

children, testified that it is "very well documented in the Human Rights Watch reports, Amnesty International as well as the United States State Department reports on human rights practices in Uganda." C.A.R. at 274. She elaborated, stating that the LRA abducts children during raids on villages and schools. C.A.R. at 274-75.

Despite the evidence in support of the LRA's practice of targeting children, there was also evidence in the record that the LRA indiscriminately persecutes civilians regardless of age. For example, the response by the INS Resource Information Center ("RIC") to an information request quoted an Amnesty International report, *Amnesty International*, "Uganda: Breaking the Circle: Protecting Human Rights in the Northern War Zone," 17 March 1999, stating that "the LRA has abducted thousands of children and adults, has unlawfully killed hundreds, possibly thousands, of civilians, has raped thousands of women and beaten thousands of men, women and children." C.A.R. at 496-97. The Amnesty International report continues, "[t]he control of the civilian population is a strategic issue for the government's Uganda Peoples' Defence Forces (UPDF) as well as for the LRA . . . . This puts civilians of all ages at the heart of the conflict, rendering them especially vulnerable to human rights abuse on both sides." C.A.R. at 503. The RIC also noted an article by *Child Newsline* which quoted the story of a former child captive. The interviewee stated, "[m]y first killing was hacking someone with a pagna (curved machete) . . . . He was a civilian, an adult, 30 years old. He was abducted [by the LRA], then he tried to escape, so they made me kill him." C.A.R. at 496.

Finally, Lukwago has conceded that the night he was abducted, the LRA also abducted three adults from his village.[5] He admitted that adults were held as captives at

---

5. Q. Were there other children with you? Were you alone [while marching to the LRA camp after his abduction]?

    A. No. Older people than me. Three people.

    Q. Older than you?

    A. Yes.

    Q. Three?

    A. Yes.

C.A.R. at 253-54.

the LRA camp.[6]

Lukwago also failed to show that the LRA targets children who oppose abduction. It is to be expected that most Northern Ugandan children fear and oppose their abduction by the LRA. Lukwago provides no evidence that he publicly opposed the LRA prior to his capture or was politically opposed to the LRA. *See Elias-Zacarias*, 502 U.S. at 483 (rejecting asylum claim because applicant failed to show that guerilla forces would persecute him on account of a protected ground, "rather than because of his refusal to fight with them").

Based on the evidence in the record, the BIA's finding that the LRA did not target Lukwago for persecution based on his age is supported by substantial evidence. The BIA found that the LRA abducted Lukwago due to its need for labor, not on account of his membership in any "particular social group." AV1 at 8. The evidence does not compel a conclusion contrary to the BIA's finding. *Abdille*, 242 F.3d at 483-84.

## 2.

### GRANT OF ASYLUM FOR HUMANITARIAN REASONS

Lukwago also claims that he is entitled to a discretionary grant of asylum for humanitarian reasons based solely on past persecution, even if there were little risk of future persecution. Pet.'s Br. at 21. In *Matter of Chen*, 20 I. & N.

---

6.

> Q. Were there any people being held [at the LRA camp] that you could tell as captives other than children?
>
> A. Yes. And us, they were big, bigger than us. Bigger than us.
>
> Q. Yes.
>
> A. Yes.
>
> Q. How many of those were there?
>
> A. There were many. I don't know the number.

C.A.R. at 220-21.

Dec. 16 (BIA 1989), the BIA recognized that in limited circumstances an applicant may be granted asylum without demonstrating a future threat of persecution. The BIA stated:

> If an alien establishes that he has been persecuted in the past for one of the five reasons listed in the statute, he is eligible for a grant of asylum. The likelihood of present or future persecution then becomes relevant as to the exercise of discretion, and asylum may be denied as a matter of discretion if there is little likelihood of present persecution. . . .

> However, there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution. . . .

> "It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate.". . . Thus, while the likelihood of future persecution is a factor to consider in exercising discretion in cases where an asylum application is based on past persecution, asylum may in some situations be granted where there is little threat of future persecution.

*Id.* at 18-19 (quoting the Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1979)).

In *Chen*, the BIA found that the applicant suffered past persecution on account of his religion, but that due to a regime change in China he did not have a well-founded fear of future persecution on account of his religion. *Id.* at 20-21. Yet, because of the severity of the persecution suffered by the applicant, the BIA granted Chen asylum for humanitarian reasons. *Id.* at 21.

Although we would characterize the persecution endured by Lukwago as atrocious and severe, Lukwago's case is distinguishable from *Chen*. The BIA found Chen had suffered past persecution on account of his religion, an enumerated ground, whereas the BIA found that Lukwago

did not suffer past persecution on account of his membership in a "particular social group," a finding we have upheld. Therefore, Lukwago, unlike Chen, is not eligible for a grant of asylum. The BIA does not have discretion to bypass the requirements of the INA notwithstanding the severity of the persecution suffered by the applicant.

**3.**

### WELL-FOUNDED FEAR OF FUTURE PERSECUTION

An applicant who demonstrates that s/he has suffered past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, triggers a rebuttable presumption of a well-founded fear of future persecution, as long as that fear is related to the past persecution. 8 C.F.R. § 208.13(b)(1). The presumption only may be rebutted by an IJ's finding by a preponderance of the evidence that:

> (A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution . . . on account of race, religion, nationality, membership in a particular social group, or political opinion; or

> (B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so.

*Id.* § 208.13(b)(1)(i). The INS has the burden of establishing either changed circumstances or the reasonableness of relocation. *Id.* § 208.13(b)(1)(ii). If an applicant meets all of the statutory criteria, the Attorney General has discretion to grant asylum, but "is not required to do so." *Fatin*, 12 F.3d at 1238.

An applicant who fails to demonstrate past persecution may still qualify for asylum by showing that s/he has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion if returned to his or her native

country. For this purpose, the "particular social group" in which Lukwago claims membership is children from Northern Uganda who have escaped from involuntary servitude after being abducted and enslaved by the LRA. This differs from the class that he proffered in connection with his claim for asylum for past persecution, as this group is limited to former child soldiers who have escaped LRA captivity.

Lukwago argues that he has a well-founded fear of persecution by either the Ugandan Government, the LRA, or both, if he is returned to Uganda. He asserts that he will be persecuted by them either because of the "particular social group" that he proffers and/or because of the political opinion they impute to him. Because Lukwago's definition of the "particular social group" is limited to escaped LRA child soldiers and that is also the basis of the political opinion imputed to members of that social group by the Ugandan Government and the LRA, we consider the two grounds together.

The term "well-founded fear" has both a subjective and objective component. *Abdille*, 242 F.3d at 495-96. An applicant must "show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." *Id.* at 496 (citation omitted).

As in *Abdille*, here the BIA does not challenge Lukwago's subjective fear of persecution. However, the question remains whether that fear is objectively reasonable. On appeal, Lukwago has the burden of showing that the record would compel a reasonable adjudicator to find that he has a well-founded fear of future persecution based on an enumerated ground, in this case based on the "particular social group" that Lukwago proffers or an imputed political opinion.

### a. Fear of Persecution by the Ugandan Government

In seeking our review of the BIA's rejection of his claim of a well-founded fear of persecution by the Ugandan Government, Lukwago contends that if he is returned to Uganda the Ugandan government will persecute him as a former rebel fighter despite the fact that his participation

with the rebels was compelled by the LRA. He claims that due to his past participation in rebel attacks and battles against the government, the Ugandan government will also impute to him an anti-government political opinion. Lukwago has the burden of proof on this issue.

Lukwago proffers his own testimony as well as other evidence to show that his fear of persecution by the Ugandan Government is objectively reasonable. Lukwago testified that after his escape, he feared being seen by the government because he would be killed or put in prison. C.A.R. at 214. In response to the question why the government would do this, he replied "[b]ecause I was the rebel fighting against the government." C.A.R. at 214. Dr. Dicklich also testified that any person the government suspects of being a rebel will be killed. C.A.R. at 279.

The Department of State noted reports that the Ugandan government detained LRA child soldiers for several months and that "the military used the children to help find LRA landmines and arms caches." C.A.R. at 553. The RIC cited a report that government soldiers opened fire on a group of 80 child rebels collecting water, killing at least 30 of the children. C.A.R. at 497. The Human Rights Watch reports that some children have been detained on treason charges and subjected to physical abuse while in government custody. C.A.R. at 505.

Despite these reports, the BIA rejected Lukwago's claim, based primarily on the fact that Uganda instituted an amnesty policy for former rebels. The BIA stated that "the grant of amnesty reflects a willingness on the part of the government to disregard past rebel affiliation." AV1 at 9. The RIC report also notes that "the government's policies toward abducted LRA child soldiers who escape or are captured has generally been more humane." C.A.R. at 494. Dr. Dicklich testified that the official Ugandan government position is that child rebels "are usually taken to an army barracks in Gulu in particular and then they're given to some of the NGOs [non-governmental organizations], in particular there is an NGO World Vision Uganda takes some of the child soldiers and does psychological treatment for them." C.A.R. at 279. She conceded that the government

has "given more sympathy to child soldiers in general." C.A.R. at 281.

A 1997 Amnesty International report summarized the situation at the time of its inquiry as follows:

> [T]he [government] is following a policy of encouraging LRA soldiers to give themselves up. The authorities emphasize that the majority of LRA fighters are abducted children who have fought against their will. Although they may have committed gross human rights abuses, the fact of abduction and childhood allows the government to follow a policy of reintegration rather than punishment. Officially escaping or captured LRA soldiers remain only a short time in military barracks before being transferred to the non-governmental organizations World Vision or GUSCO for counselling and therapy. It appears that this official policy is in general what happens in practice.

C.A.R. at 497-98.

Lukwago contends that the Ugandan government does not adhere to its official amnesty policy. Dr. Dicklich testified that "the presidential amnesty doesn't always trickle down in terms of being known to [government] soldiers . . . . So I would have my doubts about the effectiveness of the presidential amnesty on rebels." C.A.R. at 279-80. The Ugandan government has denied these allegations, C.A.R. at 848, and Amnesty International reports that the "vast majority" of former child soldiers who were interviewed stated they were treated well. C.A.R. at 848. Following the oral argument, Lukwago's counsel sent the court, without comment, the 2002 Uganda Country Report issued March 31, 2003. That Report states, *inter alia*, that "the Government has made limited progress in implementing provisions in the amnesty act related to the repatriation and resettlement of former rebels because of funding constraints." 2002 Country Report at 12. Even if we could consider that information, it does not detract from the opinion of the United States Embassy in Kampala that it would be unlikely that the Ugandan government would harm former abductees. C.A.R. at 487-88. Moreover, there is nothing in the record to suggest that the Ugandan

government would impute to former child soldiers an anti-government political opinion independent of their status as former child soldiers.

It follows, based on the record before the BIA, that its finding that Lukwago does not have a well-founded fear of persecution by the Ugandan Government on account of his membership in a "particular social group" or an imputed anti-government political opinion is supported by substantial evidence in the record, and we have no basis to disturb it.

### b. Fear of Persecution by the LRA

Lukwago's claim of fear of future persecution from the LRA if he is returned to Uganda has considerably more support in the record. In its brief on appeal, the INS concedes that the Amnesty International report in the record states that northern villages "shunned escaped abductees, for fear of reprisal by the LRA." Resp.'s Br. at 51 n.10. Nonetheless, the BIA rejected Lukwago's claim of a well-founded fear of future persecution from the LRA because it found that he failed to show that "he is in any greater danger than other members of Uganda's population based on the fact that he is a person who, as a youth, was forced to fight with [the LRA] but escaped." AV1 at 8. The BIA noted that Lukwago "is no longer a member of that broadly-defined social group of 'children,' in that he is now an adult." AV1 at 8. The BIA also found that the record failed to demonstrate that the LRA purposefully tracks down escaped captives over time, especially given that a number of years have passed since Lukwago escaped from the LRA. AV1 at 8.

In considering whether Lukwago met his burden to demonstrate a well-founded fear of future persecution on account of one of the INA's protected categories, we must examine the Supreme Court's discussion of that statutory requirement in its opinion in *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). In that opinion the Court compared the standard in § 243(h) of the INA for withholding of deportation ("it is more likely than not that the alien would be subjected to persecution" in the country to which he would be returned) with the standard for asylum in § 208(a)

("well-founded fear of persecution"). *Id.* at 423. The Court rejected the INS' position that § 208(a) requires a showing that persecution would be more likely than not. *Id.* In that connection, the Court analyzed the § 208(a) standard and stated that "the reference to 'fear' in the § 208(a) standard obviously makes the eligibility determination turn to some extent on the subjective mental state of the alien." *Id.* at 430-31. The Court provided some additional guidance when it explained that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id.* at 431.

The Court illustrated the point in its next sentence:

> As one leading authority has pointed out:
>
> "Let us . . . presume that it is known that in the applicant's country of origin every tenth adult male person is either put to death or sent to some remote labor camp. . . . In such a case it would be only too apparent that anyone who has managed to escape from the country in question will have 'well-founded fear of being persecuted' upon his eventual return." 1A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966).
>
> This ordinary and obvious meaning of the phrase is not to be lightly discounted.

*Id.* (citations omitted).

An applicant may use testimonial, documentary, or expert evidence to show both a subjective and an objectively reasonable fear of future persecution. We stated in *Balasubramanrim v. INS*, 143 F.3d 157, 165 (3d Cir. 1998), that if documentary evidence is lacking, an "applicant's credible, persuasive, and specific testimony may suffice" to establish an objective fear of persecution. Lukwago was not required to show that persecution would be more likely than not or even probable. Lukwago was only required to show that his fear was subjective and objectively reasonable. *Gomez*, 947 F.2d at 663; *Lwin*, 144 F.3d at 509.

We thus turn to apply these general standards to Lukwago's case. The BIA denied Lukwago's claim that he

had a well-founded fear of persecution by the LRA on three bases. The relevant paragraph of its opinion is set forth in the margin.[7] The BIA stated that Lukwago is no longer a child and that he has not shown that he might be in any greater danger than other members of Uganda's population.

The BIA's reference to Lukwago no longer being a child is not to the point because Lukwago does not assert, for purposes of his claim of a well-founded fear of future persecution, a social group based on age. He asserts that he is a member of the group of *former* child soldiers who have escaped.

We incorporate here our prior discussion of the characteristics of a "particular social group" in the context of past persecution. *See supra* at 14-15. We note, however, that the issue presented for purposes of this discussion is distinguishable from the prior discussion in that this group is not dependent on a member's current age, but rather the shared experience of abduction, persecution and escape at a time when he was a child. The INS has offered no persuasive reason why a "particular social group" under the INA may not consist of former child soldiers who have escaped LRA enslavement. In fact, when the BIA defined a

---

7.

> Nor has the respondent established that he has a well-founded *fear of persecution* by the LRA in the future based on his membership in a particular social group. His claim is that if he returns to Uganda LRA members are going to recognize him as a *former abducted child who escaped*, and they will take him back to the camps and kill him in front of the children who are there. We first note, however, that the respondent is no longer a member of that broadly-defined social group of "children," in that he is now an adult. Moreover, although he presented *some evidence that children who attempt to escape and are caught* are harmed, he presented no evidence that persons who have successfully escaped are sought out or harmed at a later date. Although the *background evidence* supports his concern that *he might be in danger from the LRA* upon return, he has not submitted any evidence to indicate that he is in any greater danger than other members of Uganda's population based on the fact that he is a person who, as a youth, was forced to fight with them but escaped.

AV1 at 8 (emphasis added).

"particular social group" in *Acosta* as "a group of persons all of whom share a common, immutable characteristic," it stated, "[t]he shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership." 19 I. & N. Dec. at 233. In *Fatin*, we accepted gender as a basis for a "particular social group," noting that in *Acosta*, "the Board specifically mentioned 'sex' as a[ ] . . . characteristic that could link the members of a 'particular social group.'" *Fatin*, 12 F.3d at 1240. Similarly, membership in the group of former child soldiers who have escaped LRA captivity fits precisely within the BIA's own recognition that a shared past experience may be enough to link members of a "particular social group." *Acosta*, 19 I. & N. Dec. at 233. Lukwago's proffered group is not dissimilar from that suggested in *Acosta* where the BIA stated that the shared characteristic "might be a shared past experience such as former military leadership." *Id.*

Lukwago shares the past experience of abduction, torture, and escape with other former child soldiers. His status as a former child soldier is a characteristic he cannot change and one that is now, unfortunately, fundamental to his identity. *See Lwin*, 144 F.3d at 512 (concluding parents of student dissidents share a "'common immutable characteristic' sufficient to comprise a particular social group") (citation omitted). Inasmuch as we interpret the INA's reference to a "particular social group" to include the definition Lukwago has proffered, the record fully supports his claim that he is a member of the alleged "particular social group" and that he has a subjective fear of persecution by the LRA.

Therefore, the remaining question is whether Lukwago has demonstrated that there is a reasonable probability that the LRA will target him for future persecution if he returns to Uganda. We use the substantial evidence standard to review the BIA's finding of no reasonable fear.

Lukwago submitted extensive evidence in support of his fear of LRA retaliation. Lukwago testified that after he escaped, he hid in his uncle's house and was afraid to go outside. He testified that he was scared of the LRA, stating,

"if they see me, they catch me and take me back to the camp. And they kill me in front of the other children." C.A.R. at 214. His testimony is supported by his observations of the LRA's killing of other child soldiers who were unsuccessful in their attempts to escape.

His fear is also supported by Dr. Dicklich's expert testimony.[8] She stated that if children who try to escape are caught by the LRA, they are usually killed to make an example out of them. C.A.R. at 277. She also testified that "[Lukwago] could very well be subject[ed] to torture and possible death if he were returned to Uganda," noting that he is a "wanted man by both [the LRA and the government] in my estimation." C.A.R. at 282-83. She explained:

> If he returned to the north, it would be highly likely. If he were to return to Kampala, it would be likely and if I were to do that on a scale of 1 to 10, my assessment would be if he were returned to the north, he would have an 8 out of 10 in terms of being apprehended or re-abducted by the Lord's Resistance Army. In terms of going, for example, to Kampala where the Lord's Resistance Army has been known to bomb Kampala, just this past year, there's a likelihood of 6 or 7.

C.A.R. at 283. Even outside Northern Uganda, Dr. Dicklich believed that "given his background and knowing that he was a former LRA rebel, the likelihood [of persecution] increases." C.A.R. at 284-85.

The BIA's finding that Lukwago "presented no evidence that persons who have successfully escaped are sought out or harmed at a later date," AV1 at 8, is not supported by the record. On the contrary, the record shows that the LRA kills children who fail in their escape attempts and, applicable here, that the LRA also engages in retaliatory conduct to punish children who have successfully escaped.

---

8. We find Dr. Dicklich's testimony to have been important regarding a number of aspects of Lukwago's claims. However, her testimony is not discussed in the BIA's opinion and we are not certain to what extent the BIA took it into account. Obviously, as we are remanding, the BIA should give due consideration to this evidence if it did not do so previously.

Not only did Dr. Dicklich testify that such former child rebels are at greater risk of persecution by the LRA, but the Human Rights Watch report also documents cases of retaliation by the LRA. The response of the RIC, a branch of the INS, stated: "[t]he treatments meted out to children who escape from the LRA and then fall back into their hands suggest that a person within this category would be in grave danger if members of the rebel forces were to see and recognize him/her." C.A.R. at 494. The RIC cited a 1997 Human Rights Watch report which acknowledged that failed escape attempts end in death. C.A.R. at 495. In addition, even when escape attempts are successful the LRA engages in retaliatory conduct — "[f]ailed escape attempts continue to be punished by death, and successful escape attempts lead to retaliation: if one sibling escapes, the rebels often kill the other sibling, or return to the child's home village and slaughter any surviving relatives." C.A.R. at 495.

Based on the record, we conclude that substantial evidence does not support the BIA's determination that the group of escaped child soldiers is in no greater danger from the LRA than other members of the Ugandan population. Even if the group of former child soldiers were not in markedly more danger from the LRA, Lukwago's fear that he personally will suffer future persecution by the LRA if returned to Uganda may be well founded.

In his reply brief Lukwago notes that his public statements about his experience as a captured child soldier have thrust him into the position of a public figure. He states that his "application for asylum and his subsequent appeals are public record and have drawn the attention of various United States government organizations, the United Nations, and many other organizations within the public sphere." Pet.'s Reply Br. at 21. He also notes:

> [he] is featured in a Documentary entitled "Armed and Innocent," which was first presented at the United Nations Special Session on Children and seen by diplomats, representatives, and members of the media from around the word. Segments of this Documentary in which [Lukwago] was featured were broadcasted on MSNBC. On August 4, 2002, [Lukwago's] case as

> written by Melissa Dribben, including his picture and statements made in his affidavit and asylum application, was featured as the cover story of the *Philadelphia Inquirer Magazine* in the Sunday edition of the *Philadelphia Inquirer*. [Lukwago's] picture and the article were also featured on the *Philadelphia Inquirer's* website. On September 15, 2002, the Associated Press released an article written by Tina Moore on [Lukwago's] appeal, which was printed or placed on the Internet versions of several leading newspapers nationwide, including the *Boston Globe*, *Washington Post, New York Times*, and *Sun-Sentinel*.

Pet.'s Reply Br. at 21-22.

The INS argues that the LRA will not be able to identify Lukwago after more than a five-year absence but cites to no evidence as the basis for that argument. Lukwago asks us to take judicial notice of the considerable amount of publicity that his case has received which leads him to state that it is reasonable to conclude that there is at least a 10% chance that he will be seen and recognized by the LRA. If Lukwago has become a public person, there is no reason to believe that his widespread reports of enslavement by the LRA would not have come to the LRA's attention. If the LRA is able to retaliate against an escaped child's village or family, it is not unreasonable to believe its members could retaliate against the escaped child himself or herself. Of course, it would not be appropriate for this court to decide the relevance of the material referred to by Lukwago in the first instance. We will instead remand so that the BIA can determine what effect such widespread publicity has on Lukwago's well-founded fear of future persecution by the LRA and whether the record should be reopened to accept that patently relevant material.[9] *See, e.g., Miller v. United States INS*, 762 F.2d 21, 24-25 (3d Cir. 1985).

---

9. Because we will remand to the BIA, we need not decide the scope of judicial notice that would be appropriate in light of the statutory provision that limits our review to matters on the record before the BIA. *See* 8 U.S.C. § 1252(b)(4)(A).

The INS asserts that Lukwago only has a well-founded fear of persecution if he is returned to Northern Uganda. The INS regulations require that an applicant claiming fear of persecution by a non-governmental entity "avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. §§ 208.13(b)(2)(ii), 208.13(b)(3)(i).

Lukwago, who had the burden on this issue, provided evidence in the record that relocation would not eliminate the risk of persecution and that relocation would be unreasonable. Dr. Dicklich testified that the "LRA has a longer reach than just in the north." C.A.R. at 285. She also testified that given Lukwago's background as a former child soldier he is at a higher risk of harm by the LRA than the general Ugandan population. C.A.R. at 284-85. On the question of relocation, Dr. Dicklich stated that kinship is important in Ugandan culture and that "[y]ou don't want to move too far from your roots." C.A.R. at 298. Moreover, Lukwago's absence of family in other parts of Uganda would result in a high likelihood that Lukwago would be homeless and on the streets. C.A.R. at 285.

The BIA did not decide the issue of whether relocation would abate the risk of persecution by the LRA and whether it would be reasonable. Therefore, on remand the BIA should consider the issue of relocation. *See INS v. Ventura*, 123 S.Ct. 353, 355 (2002) (reversing the judgment of the Court of Appeals and remanding to the BIA because it had not considered the issue of changed circumstances).

Finally, we consider Lukwago's argument that as an escaped captive the LRA will persecute him based on imputed anti-LRA political opinions. The Court of Appeals for the Seventh Circuit has explained that "[a]n imputed political opinion is a political opinion attributed to the applicant by his persecutor." *Lwin*, 144 F.3d at 509. We have also held that "[t]he persecution may be on account of a political opinion the applicant actually holds or on account of one the foreign government has imputed to him." *Balasubramanrim*, 143 F.3d at 164 n. 10; *see also*

*Estrada-Posadas v. United States INS*, 924 F.2d 916, 919 (9th Cir. 1991) ("[O]n limited occasions, certain conscious and deliberate acts or decisions by an alien may establish a well-founded fear of persecution on account of imputed political opinion, but only when a persecutor attributes political beliefs to the alien as a result of these acts or decisions"). Here, Lukwago asserts that the LRA will impute to him an anti-LRA political opinion because he escaped enslavement. As is often the case, Lukwago's political opinion argument is entwined with his social group claim. *See Fatin*, 12 F.3d at 1242.

For an imputed political opinion claim, Lukwago must show that the LRA has attributed to him an anti-LRA political opinion and that he has a well-founded fear of persecution based on that imputed political opinion. In an affidavit, Lukwago stated, "[b]ecause I was taken by the LRA and I escaped, I am a target for the LRA. They assume that people who escape are against what they stand for and they kill them." C.A.R. at 540.

Lukwago's public explanation of the reason he escaped from the LRA provides ample evidence of his opposition to the LRA. He stated:

> I thought about everything that the LRA had done. I thought about how they had killed my parents right in front of me. I remembered the kids they had beaten and I thought about the children who had been killed. I thought about my friend, Joseph, and about the little girls who were given to the soldiers as wives. The LRA were bad people. I remembered how they had looted villages and cut the lips and fingers off of villagers. I will never forget seeing that and hearing the people scream in pain and cry out for the pain of their loved ones.

> [ ] I thought about all of this and I said to myself, "if I die, I die." I couldn't stay there anymore. I started to run.

C.A.R. at 536. The BIA did not make any findings on his imputed political opinion claim with regard to the LRA. This issue also should be considered by the BIA on remand.

33

## B.

### WITHHOLDING OF REMOVAL

Lukwago also seeks protection under INA § 241(b)(3), the statutory provision which provides for mandatory withholding of removal for an applicant who meets all of the statutory criteria. 8 U.S.C. § 1231(b)(3)(A); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). The standard for withholding of removal is higher than, albeit similar to, the standard for asylum. *Balasubramanrim*, 143 F.3d at 165. As in the case of asylum, the applicant must show that s/he will be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion if deported. 8 C.F.R. § 208.16(b). However, in the case of withholding of removal, the applicant must show that such future persecution is "more likely than not" to occur. *Id.* § 208.16(b)(2); *see Cardoza-Fonseca*, 480 U.S. at 430-31.

If Lukwago is unable to satisfy the standard for asylum, he necessarily fails to meet the standard for withholding of removal under INA § 241(b)(3). Because we have found that there is substantial evidence to support the BIA's determination that Lukwago failed to demonstrate past persecution by the LRA or a well-founded fear of future persecution by the Ugandan government, he cannot meet the standard for withholding of removal for these claims.

We are remanding to the BIA the issue of whether Lukwago is entitled to a grant of asylum for a well-founded fear of persecution by the LRA on account of his membership in the "particular social group" of former child soldiers or on account of imputed anti-LRA political opinions. Because the BIA rejected these grounds as bases for asylum, it followed that it declined to withhold removal for these claims. AV1 at 9. As we are remanding to the BIA for reconsideration of whether Lukwago has demonstrated a well-founded fear of persecution by the LRA for purposes of asylum, a fuller consideration of Lukwago's eligibility for withholding of removal on these claims is also warranted on remand. In addition, as in *Ventura*, the BIA should conduct an analysis of whether there have been changed

circumstances that would affect Lukwago's request for removal and/or whether Lukwago's relocation within Uganda would be reasonable. *See* 8 C.F.R. § 208.16(b)(3).

## C.

### PROTECTION UNDER THE CAT

Finally, Lukwago seeks protection under the CAT. The standard for withholding of removal under the CAT is different than that for INA § 241(b)(3). Lukwago must show that it is more likely than not he will be tortured if removed to Uganda. 8 C.F.R. § 208.16(c)(2). Under the CAT, torture is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind. . . .

8 C.F.R. § 208.18(a)(1).

The CAT does not require a showing that the torture is on account of any protected ground, but only applies to torture that "is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* The applicable regulation provides that to meet the standard of "acquiescence of" a public official, "the public official, prior to the activity constituting torture, [must] have awareness of such activity" and breach his/her legal responsibility to intervene. *Id.* § 208.18(a)(7). Lukwago has not only failed to demonstrate that the Ugandan government acquiesces in the LRA's activities, but the evidence he submitted shows that the Ugandan government and the LRA are in continuous opposition.

The only remaining question for our review of the BIA's denial of withholding of removal under the CAT is whether

Lukwago demonstrated that it is more likely than not that the Ugandan government will torture him if he returned. The BIA's finding to the contrary was not against the weight of the record. Given the Ugandan government's amnesty policy and the assurances of the United States Embassy, the BIA had substantial support in the record to deny Lukwago's request. Therefore, we will deny Lukwago's Petition for Review of the BIA's denial of his request for protection under the CAT.

## V.

## CONCLUSION

In summary, we will deny the Petition for Review to the extent that it is based on Lukwago's claim to asylum for past persecution to the class he proffers or seeks asylum for humanitarian reasons based on past persecution. We will also deny the Petition for Review to the extent it is based on Lukwago's application for protection under the CAT. With respect to Lukwago's claim of a well-founded fear of future persecution, we will deny the Petition for Review insofar as Lukwago's claim is based on fear of persecution by the Ugandan Government. We will remand for reconsideration by the BIA the remainder of Lukwago's claim for asylum based on a well-founded fear of persecution in the future by the LRA because we hold that the class of former child soldiers who have escaped from the LRA fits within the statutory definition of a "particular social group," because there is evidence that the class may be in more danger from the LRA than the general population, and because Lukwago may be in considerably more danger than most other members of the class on account of an anti-LRA imputed political opinion. On remand, the BIA should also reconsider Lukwago's application for withholding of removal under INA § 241(b)(3) for the same reasons.

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*